Case number 241639 Belinda Fitzpatrick v. Kyle Hanney et al. Oral argument not to exceed 15 minutes per side. Ms. Henderson, you may proceed for the appellant. Thank you. Good afternoon. May it please the court, Callie Henderson for the defendant Matthew Simon. May I please reserve three minutes for rebuttal? Now this case presents a straightforward issue of qualified immunity at the application of which defendant Simon's position is should have resulted in dismissal under both prongs as to both issues. When defendant Simon was invited to participate in the execution of a search warrant to seize animals subjected to unsanitary and unsafe living conditions, he did not violate the Constitution or any of the clearly established precedent from this circuit under the 4th or 14th Amendment. Now turning first to the 4th Amendment issue concerning whether he appropriately attended the execution of the search warrant. This court, I believe both Judge Larson and Judge Batchelder have issued opinions stating that a joint execution of a search warrant is appropriate when the purposes in the search, what the agency officials are looking for, are the same. And that's exactly what happened here. Defendant Simon was acting under Defendant Haney. His search warrant, which was for unsafe and unsanitary living conditions, he had the authority under the warrant to seize animals subjected to such conditions. That is exactly what defendant Simon is charged with and that is what he was looking for under the warrant. Unsafe and unsanitary living conditions, whether human or animal. And that's exactly what they found, such that there's no allegation that he exceeded the scope of that warrant. The question is just whether he could act under that warrant. And the district court erred by relying on Gardner to create a universal rule that the joint operations and executions of search warrants aren't permitted. That's simply not what Gardner held and Gardner did not overrule the prior precedent of this court in cases like Garcia and Castro, which permitted the joint operations. Such that to apply Gardner to say that there's this universal principle that agencies cannot execute a search warrant together when they're serving the same purpose, looking for the same evidence, is just wrong. And then when we apply that to the second prong of qualified immunity... So the living conditions for the chickens and the living conditions for the people are the same thing? Your Honor, in this case, under these facts, yes, they're in a house. That's what they're looking for. They're looking at a residence. The allegations in the warrant was that the house was very messy, cluttered, and there's chicken feces and animal feces strewn throughout the entire residence. Such that I would posit under those circumstances, when we're looking at the facts that have been pled, those circumstances are unsafe for animals. Those are also unsafe for humans. And that's actually what the building codes, International Property Maintenance Code, has defined as unsafe or unhabitable for humans. And while I would agree that maybe not always is a condition that's going to be unsafe for a chicken also going to be unsafe for a human, but under the facts that we're dealing with here, that's exactly the case. I think I'd like to turn now to the 14th Amendment issue, which, again, when we look at this under both prongs, Defendant Simon is entitled to qualified immunity. This court has previously said that under emergent conditions, red tags can be issued. Red tags that essentially are an And there's no issue as to the notice provided. That's not before this court right now. The issue is whether it was appropriate. And the district court erred by finding that there was not emergent conditions that justified the red tag because the chickens were gone and the plaintiff was not home at the time. But that ignores the purpose of the red tag and Defendant Simon's whole purpose within the community, which is to protect her from those conditions going forward. There's no allegations that she was never going to return to that property, that removing the chickens removed the problem. The feces, everything was still there. The homes remained the same. She still could return to the home. That's the purpose of the red tag. What's the evidence that it was uninhabitable, though? I mean, we have these cases where, you know, I'm looking at Flatford and Gardner as I'm kind of seeing these as two different polls. And I guess my question is, why is this on the Flatford side? If I have the cases right, the structural failure, immediate risk of electrical fire versus the accumulation of debris or smoke alarms not working, things like that in Gardner. Your Honor, I think we agree with you that we're looking at two different polls here. And whether we are falling towards Gardner, I think it's pretty clear that Gardner discussed that these are minor violations that were kind of not really making a house uninhabitable. They were just code violations. There was no evidence of the seriousness or danger of those violations. Versus in Flatford, this was a dilapidated building, emergent conditions. I think there was combustibles on the property. Right, the building's about to fall in or something. Right, like exposed electrical that could cause a fire immediately. And I think, yeah, sure, sorry, Your Honor. Yeah, I think if you look at our brief, that's where the zoning codes and the International Property Maintenance Code define what is unsafe or unfit for human occupancy. And feces is one of those things. And to me, you say there's feces all over the house. I don't even need to look to a property maintenance code to know how dangerous feces could be to a human, to spread disease. It matters to me, in this case, how much feces. And we didn't get to discovery in this case. And I don't know if you're a pet owner, but it strikes me that pet owners know, dog owners know, that at the beginning and end of a dog's life cycle, there could be feces on your floor. And is it your position that it's okay to red tag a house at that moment and kick somebody out of their house? No, Your Honor. And I don't think those are the circumstances that were described in the warrant, either, that necessitated them going to even look at this property. More so, that there was so much feces strewn throughout both properties that it was unsafe for these animals to even be there, such that if it's then- Doesn't it say that the materials in the house were coated in feces? Yes, Your Honor. Yeah, so like all the debris that's strewn dispute that description that was in the affidavit for the warrant? Your Honor, I have reviewed, I had that question myself this morning as I was driving here, and I reviewed, and I didn't see any allegations disputing what is described in the affidavit, disputing the statements that she made in that affidavit, that are reflected that she made in that affidavit, where she's- Where she says, I'm worried that they're going to shut my house down. Yes. They're going to red tag my house. Yes, yes. So I'm not aware of any. I will stand corrected should a co-counsel point those out here. But no, as of right now, the facts are that the house was coated in the feces, and it was dangerous to have chickens there, to which I would posit that if this is unsafe for a chicken because of the amount of feces in the home, that it's likely also unsafe for humans, especially when the International Property Maintenance Code is already telling code officials that's unfit for humans to live there. So for him to rely on that, I think is reasonable under these circumstances. In order for your client to get qualified immunity, does the case need to be more like Flatford than Gardner? Or is it the plaintiff's burden to come up with a case that would tell your client that this is not an emergency? In other words, the case can be not at all, not very much like Flatford, as long as it's something worse than Gardner. Yes, Your Honor. I believe- If it's anywhere on that spectrum, your client gets qualified immunity. Yes. I believe that's traditionally what's referred to as the gray area, and plaintiff does carry that burden to show that there's a case that would have put him on notice, that is worse than Gardner, that would have told him that when you're at this level, if Gardner's back here at this pole, but this case is here and Flatford's here. So Gardner's like, the bathtub wasn't cocked appropriately, the fire alarms are at the wrong height, there's some electrical outlets that aren't covered. That is not enough to red tag somebody. Flatford tells us that if the house is about to burn down, that is enough, and we're in the middle. So as long as having a house covered in chicken poop is more dangerous than not having your bathtub cocked, your client gets qualified immunity. Yes, Your Honor. Yes. And unless the- Or at the very least, I suppose you would say that it's not clearly established that that isn't sufficient to give qualified immunity. Yes, Your Honor. I believe- That was actually- That's right, Judge Batchelder. You refrained my question. I wasn't really trying to do that. Well, you did, and I thank you. And counsel, isn't it common for these cases to be determined at the summary judgment phase? I think perhaps some people prefer that that happen, generally probably on the other side of the V than me, but when the law is such that the law is the law, the cases are the cases, and the plaintiff has pled the facts, the plaintiff had the opportunity here to put forth the facts that she needed to, to avoid the application of the law as it stands. This is very easy now for the court to say, well, this is what the law was then, and this rules it out, or, you know what, no, you've actually put us more- You've put us in Gardner territory. And if the panel has no further questions at this time, thank you. Good afternoon, Your Honors. May it please the court, Jay Nicholas Bostic on behalf of the appellee, Ms. Fitzpatrick. Judge Batchelder, to answer your question, we have not factually challenged the allegations in Officer Haney's affidavit, and the descriptions that he put in the affidavit, in large part because we not sued him for a Fourth Amendment violation. We have not gone as far as claiming that his entry violated the Fourth Amendment. His Fourth Amendment claim only deals with exceeding the scope by allowing Mr. Simon in. So you won't find in this record, as far as I know, where Ms. Fitzpatrick has said, well, paragraph three, whatever, is false or incorrect. She may disagree with, you know, some of the adjectives and adverbs that he used, and some of the- a little bit of hyperbole, but not for purposes of why we're here. So the answer to your question is we have not specifically challenged the averments in Officer Haney's affidavit. We're relying on the relief that he requested and that the warrant granted as our basis. Well, the affidavit references, if you're not challenging it, it references ammonia, I believe. The odor of ammonia. And I guess why isn't- ammonia is dangerous, right? Why isn't that enough to have evicted your client? Well, if that was enough, then that would have given Mr. Simon, perhaps, probable cause to get his own warrant. I'm talking more about the 14th Amendment. Okay. Well, it wasn't pure ammonia. It's an ammonia odor that comes from the decay of the- well, there's no urine from a chicken. Just, I learned that in researching this case. It's all one. And so the ammonia comes from the degradation of the feces. And it's- so it's an odor. It's not ammonia. So if there were a large vat of ammonia, pure ammonia in there, I probably wouldn't be standing here, but that's not what we had. So when you said to Judge Batchelder that you hadn't contested the averments in Officer Haney's affidavit, does that mean that we accept those as true as part of the- I mean, it seems to me like we would. Only if- and this was going to be my first topic, but I started answering that question. Only if Mr. Simon read them. So he's claiming that he believed he could rely on- That, again, goes to the Fourth Amendment. What about for purposes of the 14th Amendment claim? With respect to the eviction? So in other words, what is the state of the home? And I appreciated your analogy about Gardner versus Flatford. I know Gardner was Rule 56. That was my case. Okay. Flatford, I think, was Rule 56 as well. I can't say off the top of my head. But therein lies the problem. How do we determine the emergency? We have very vague descriptions, and I would make a suggestion that you'd have to go through my brief. It would be tedious to do it, but if you look at the correction notice that Officer Simon issued, and you look at the International Property Maintenance Code, what you will see is that he puts in those section numbers and that language is boilerplate. It's part of a computer program. I know that none of that's in the record yet, but you'll see a very similar set of language between what's in his correction notice and what's actually typed into the IPMC. Because it's just, they're vague, and they're very broad. So whether we get to a tiny structural defect on a porch, is that an emergency as to the whole building? Or we have a structural beam inside the home on a load-bearing wall, that's an emergency. And so we're at Rule 12. There is just a lot that we don't know, which... How do you respond to your opposing counsel's suggestion that, you know, the plaintiff client could have put that in the complaint? You know, describing why it was inhabitable, even despite the chicken feces. And as to the 14th Amendment, it's more challenging because we don't have that discovery. And how can I plead what Mr. Simon actually saw? But it's your client's home, so couldn't your client plead what the house actually looked like? Or at very least say, no, it wasn't covered that much in feces. But you just told us that you didn't dispute that description. I almost said that wouldn't help me because it would create a factual dispute. I'm in the wrong rule. For Rule 12, we could have, but the issuance of the body of the correction notice itself, I'll do it this way. In a light most favorable to the plaintiff, I am arguing that the correction notice itself does not set out an emergency. So if we just take what did Mr. Simon tell us that he saw that supported the red tag? Well, it's in his correction notice. And is that enough at this stage in a light most favorable to the plaintiff that he should get immunity? And I say that the answer is no. Maybe at summary judgment stage, he will be entitled to it, which is the preferred stage for this type of issue. Now, and of course, the 14th Amendment rests on what he saw and what he knew personally. But I want to talk about the 4th Amendment claim because if he didn't have the right to go in, then those observations become irrelevant. In the complaint, we have at paragraph 7, the 1st Amendment complaint, we have at paragraph 17, he was invited in by Mr. Haney. Mr. Haney's reports and testimony established that it's there was nothing in the record to suggest that he showed the warrant to Mr. Simon or the affidavit or that they even had any discussions about what he saw, he being Mr. Haney, when he went in with consent. And he only went into one home, but he had to search warrant for both. But again, the 4th Amendment entries for Haney are not before the court. The invitations by Haney's agency to the city of code compliance are routine. The long history is also in the 1st Amendment complaint at paragraph 63. And then the language from the ordinance itself, which says in non-emergency situations, he shall obtain a warrant. So those five points I want to suggest to the court and the light most favorable to plaintiff create an inference that Mr. Simon did not review the warrant. He did not review the affidavit. Why does that matter? Like, is it just unconstitutional per se for a state official to rely on an invitation to join a search when he that's searching? Isn't the ultimate question, are they searching for the same thing? I anticipated that question. I finally anticipated a question. So I'm surprised it took me this long. The reasonable officer's standard, the objectively reasonable officer. So I don't want to suggest that Simon's subjective determination about whether he could rely on it or not controls. It's whether the objectively reasonable officer with the case law that we have, especially the language in Gardner about the officer with the warrant being placed in temporary trust and possession. And he exceeds that when he makes an improper invitation to another state actor. So take that in mind. A reasonable, a reasonably objective state actor would take a moment before entering a dwelling, especially, to make sure that he has that lawful authority. He would go through this, it could be very short, but he needs to go through some process. I'm about to step across this threshold of a citizen's home. Why am I doing this? What is my authority? A reasonably objective, well-trained state actor would stop and do that. And I'm saying that those facts in the complaint allege, at least in inference, that he never reviewed it. And so, therefore, he was not objectively reasonable by failing to make sure he had lawful authority. So if two officers, a state officer and a federal officer, say the federal officer gets the warrant, they're going to go search for, usually the state officer would get the warrant, they're going to go search for cocaine. And they're both looking for cocaine. State officer has the warrant. The federal officer knows they're looking for drugs. The federal officer doesn't say, hey, I want to see the warrant to the warrant affidavit. But turns out they go in and they find drugs, exactly what they were looking for. He's violated the Fourth Amendment by not, like he got, maybe he just got lucky, but has he violated the Fourth Amendment? Yes. Okay. So you must, so your rule is, you must at every time, you must always look. I'm saying that as a matter of Fourth Amendment law, a state actor, a reasonably objective, well-trained state actor would make sure that he has authority to enter. If he doesn't, then yes, he has violated the Constitution. But after the fact, it turns out he did have authority to enter because he was looking for the same thing. And I think it's well established that we never justify searches by the result of the search. But so you're saying that one officer cannot rely at all on what the second, the other officer who has been in there and seen all of this has seen and has sworn to and now tells him about. That you're saying is not, that is not protected. No, that's not what, no, I'm not, I'm not saying that. Because if they had a conversation and the full basis of everything that Mr. Haney saw was disclosed to Mr. Simon, that might've given him probable cause. But now we look at Castro, we look at Horton, we look at Wilson v. Lane, we look at Gardner. The second officer must be assisting in the goals of the officer with the warrant. Okay, so when you say assisting in the goals, are you saying that because the one officer was looking to see whether the habitation was okay for humans and the other was looking to see whether the habitation was okay for chickens, those are so different that they're not looking for the same thing? Yes, because Officer Haney's, the plain language of the warrant is two things. Animals, alive or deceased, and animals subject to unsanitary or unsafe conditions. Animals in both. I know that they're arguing that the conditions, but Officer Haney was not looking for conditions. His warrant authorized him to look for animals, not conditions. Mr. Simon went in looking solely for conditions. Wasn't he looking for animals living in unsafe conditions? Unsafe and unsanitary conditions? So in order to be looking for the animals living in those conditions, you have to be looking for the conditions? Well, Officer Haney would have to do that, yes, but Officer Simon didn't go in to assist Officer Haney. So is it clearly established that looking for beings living in unsanitary conditions is so different from the conditions themselves that this officer should have understood that difference and that he needed his own, would have to have his own warrant in order to go in? Yes. Is that clearly established? I think it is because he's pursuing a completely different goal. Castro was interesting because literally the same evidence just simply went to two different places. Home invasions. Texas penal statute, predicate act for RICO. That's easy. Sanchez is interesting, and Garcia relies heavily on Sanchez, and Sanchez gave us the three tests. Does the federal officer have probable cause? It doesn't have to be a federal officer. The ride-along officer, I'll call him. Does he have probable cause, may I continue? Sure, quickly. Does he have probable cause to obtain a separate warrant? Did he have the opportunity? Was he searching for items, items different? That's my question. Right. You're saying that it was clearly established that items and conditions are different such that Officer Simon should have understood that he couldn't go in without his own warrant. Yes, and only because of Horton, Lane, Gardner, that the warrant's face said, I'm searching for animals. That's the reason. All right. Thank you, Mr. Bostick. We will hear rebuttal. I have only one short point on rebuttal. I don't want to belabor anything. I don't see a need at this point, but I would just say as I stand here on behalf of a code officer and have been here before on behalf of several other officers that the standard advocated for today by the plaintiff here is entirely unworkable. I would discourage this court from adopting such a standard that would require that every officer on a task force, on a team of different agencies be fully educated in the premise, the affidavit of a warrant, and be 100% knowledgeable about that warrant and have their own copy such that that's a completely unworkable standard. And unless the panel has any further questions. I will conclude. All right. Thank you. Thank you. Thank you both for your helpful arguments today.